**GRIMLAND v. WILLIAM CAMERON & CO., Inc.**

No. 14005.

Court of Civil Appeals of Texas. Fort Worth.

Jan. 12, 1940.

Rehearing Denied Feb. 23, 1940.

E. B. Hendricks, J. E. Warren, Jack Carter, Rawlings & Sayers, and Nelson Scurlock, all of Fort Worth, for plaintiff in error.

Sleeper, Boynton & Kendall, of Waco, and Charles Kassel, of Fort Worth, for defendant in error.

BROWN, Justice.

Appellant, Grimland, brought suit against appellee, Wm. Cameron & Company, Inc., alleging that he is a real estate broker and that, in 1935, appellee had a large amount of real estate in the cities of Fort Worth, Waco and San Angelo, Texas, which it desired to exchange for ranch property in Texas, and that the agent of appellee, who was manager of its Fort Worth office, went to the office of George Beggs, in Fort Worth—said Beggs being engaged in the real estate business and being a broker—and listed appellee's said properties with Beggs and employed Beggs to procure for appellee ranch lands in exchange for its said properties, at a price and on terms acceptable to appellee. That the listing was made with one McBrayer, the duly authorized and empowered agent of said Beggs, who was in charge of the real estate department of said Beggs. That thereafter, and on or about September 1st, 1935, the said McBrayer, acting for George Beggs, with the knowledge and acquiescence of appellee and its said Fort Worth agent, listed said real estate with appellant on the same terms and at the said prices the same had been listed with the said George Beggs, and that said McBrayer, acting for said Beggs, and duly authorized to act, agreed to pay appellant, for his services, one-half the commission that might become due said Beggs, should plaintiff (appellant) procure for the appellee and said Beggs ranch lands that could be traded for appellee's real estate in Fort Worth, Texas, on terms and at prices acceptable to appellee, and "whereby plaintiff was duly employed by the said George Beggs and defendant to find and procure for defendant and the said George Beggs ranch lands in Texas that could be exchanged for defendant's said real estate in Fort Worth, Texas, on terms and at prices acceptable to defendant."

Appellant next alleges efforts to interest appellee in several propositions which were acceptable to appellee—one being known as the Caldwell lands. That McBrayer went to Waco, Texas, to the general offices of appellee and put up the proposition relating to the Caldwell lands, but appellee would not consider the proposition, and that "said officers of defendant were then and there fully informed of plaintiff's said employment by the said George Beggs, as aforesaid, and made no objection to plaintiff's said employment, and acquiesced therein,

and after having all of said information, and the further information that plaintiff had been principally instrumental in presenting said Caldwell proposition in writing, requested McBrayer to procure for defendant additional propositions of exchange, and whereby defendant then and there acquiesced in plaintiff's said employment, and did then and there impliedly promise and agree to pay plaintiff and the said George Beggs 2½ per cent commission on any exchange of ranch property for defendant's said real estate in Fort Worth that might be accepted by defendant at prices and on terms satisfactory to defendant."

Appellant further alleged that thereafter he went to Waco, to the general offices of appellee, and saw its president, to ascertain at what price appellee would be interested in exchanging its properties for the Caldwell ranch, and to secure a list of all real estate owned by appellee that it desired to exchange for ranch lands, and to ascertain from appellee's officers whether or not they would be interested in trading for the "McGregor Ranch" in Culberson County, Texas, as well as another ranch in the vicinity of the McGregor Ranch, and that in his interview with the president of appellee company he was advised that one Zimmerman, a vice-president of appellee, was looking after such matters; that Zimmerman was out of the city and plaintiff was invited to return to Waco and to take up all such matters with Zimmerman; that at such time plaintiff told appellee's president that plaintiff "had been trying to secure from the agent and the owner a tangible proposition to exchange the said McGregor Ranch * * * for a part of defendant's real estate situated in Fort Worth, Waco and San Angelo, Texas, and plaintiff did then and there point out said McGregor Ranch, or the approximate location thereof, on a road map then in the possession of plaintiff, to the said president of defendant."

That the said president told plaintiff appellee would be interested in securing a proposition on the McGregor Ranch and then requested plaintiff to secure a proposition from the owners of such ranch on an exchange basis.

That plaintiff thereafter, on or about October 25th, 1935, returned to Waco and interviewed the said vice-president, Zimmerman, who declined to further consider the Caldwell lands; that plaintiff told Zim-

merman what he told appellee's president about the McGregor lands, and Zimmerman told plaintiff appellee would be interested in a proposition relative to the McGregor lands and requested plaintiff to procure such a proposition from the owners of their agents; and Zimmerman promised to mail plaintiff a complete list of all real estate that appellee owned in Fort Worth, Waco and San Angelo, Texas, that it had to exchange for ranch lands at prices and upon terms acceptable to appellee. That within a few days such list was mailed to plaintiff, "And whereby, and by reason of the facts alleged in this subdivision of this petition, defendant expressly and impliedly employed this plaintiff to procure for defendant ranch land in Texas. And defendant did then and there impliedly agree to pay plaintiff the usual and customary commission charged by brokers in Texas and in Tarrant County, Texas, for their services in procuring an exchange of real estate." This he alleges to be 2½% "of the value of the real estate procured for exchange."

Plaintiff further alleged that prior to his first visit to Waco, he had contacted "one Pawkett of the real estate firm of Breeding and Pawkett of Fort Worth, Texas, who claimed he represented the owners and the agents of the said McGregor Ranch and further informed plaintiff that said ranch could be procured by him for exchange of real estate in Fort Worth and other cities in Texas, and whereupon the said Pawkett was fully informed that plaintiff and George Beggs had certain real estate of defendant's listed with plaintiff and the said George Beggs for exchange for ranch land in West and Southwest Texas at prices and upon terms acceptable to defendant, and did then and there request said Pawkett to write to the owner and agent of said McGregor Ranch to come to Fort Worth, Texas, and inspect defendant's said real estate located in said City."

Plaintiff next alleges that Pawkett, prior to the time plaintiff contacted him, and many times since such date, corresponded with a real estate broker named Wilmoth, who resided in El Paso, Texas, said Wilmoth being the exclusive agent of and for the McGregor Ranch lands; and that Pawkett advised plaintiff that he, Pawkett, could not secure the agency for the McGregor Ranch for exchange, and that said Wilmoth was the exclusive agent of and

for same and that Wilmoth would not agree to divide the commission with Pawkett, and informed plaintiff that Wilmoth and the owners of the McGregor Ranch would shortly visit Fort Worth to inspect defendant's real estate, and that if plaintiff did not agree to divide the commission with him, Pawkett, that he would cause Wilmoth to exchange the ranch for other real estate than that owned by the defendant, but that plaintiff refused to divide the commission because Pawkett had agreed to look to the owners of the ranch for his commission. That on or about November 5th, 1935, Wilmoth, together with the owners of the said ranch, came to Fort Worth to inspect defendant's property, and when they arrived Pawkett induced them "to go around plaintiff and to ignore plaintiff", and they then went to Waco, to defendant's general offices and entered into negotiations with defendant for exchange of their respective lands, and that the exchange agreement bears date December 31st, 1935; and on or about April 29th, 1936, the agreement was carried out and "the said real estate of defendant, or a part thereof, listed with plaintiff and the said George Beggs was exchanged for the said McGregor Ranch at a valuation of $80,000.00 of the equity the said McGregors had in said ranch."

Appellant next alleges that he was the procuring cause of such exchange of lands, and that "at the time plaintiff procured said ranch through the said Pawkett, as aforesaid, neither the defendant nor anyone representing the defendant except plaintiff and the said George Beggs and his said agent knew that said McGregor Ranch could be procured as an exchange for a part of defendant's said real estate. * * That at the various times plaintiff contacted the said Pawkett and induced him to write the said Wilmoth concerning the exchange of said real estate, plaintiff and the said George Beggs and the agent of the said George Beggs were still in the employment of defendant as agents and brokers for the purpose of procuring ranch lands for exchange of part of defendant's said real estate in said city, and that by reason of being the procuring cause for the exchange of said real estate as aforesaid, defendant is justly due the said George Beggs and plaintiff 2½% commission on the valuation of the said equity of $80,000.00 of said McGregor Ranch."

Appellant next alleges that long prior to the filing of the suit, "George Beggs, act-

ing by his duly authorized agent, J. D. McBrayer, for a valuable consideration, assigned and transferred to plaintiff the entire interest of the said George Beggs in and to said commission by reason of a verbal assignment."

He next alleges that defendant had verbal and written notice that plaintiff and George Beggs "was the procuring cause of said exchange of said property and that plaintiff and the said George Beggs expected defendant to pay them said commission." That such notice was given defendant prior to the time it entered into the agreement to make the exchange of lands.

He then alleges "that by reason of all of the foregoing alleged facts contained in this petition, defendant at least impliedly employed plaintiff to procure for defendant the exchange of defendant's said real estate, or a part thereof, for ranch lands in Texas, and impliedly agreed to pay plaintiff and the said George Beggs the usual and customary commission in such cases should plaintiff and the said George Beggs, or either of them, procure for defendant ranch lands in Texas that could be exchanged for a part of defendant's said real estate, at prices and upon terms acceptable to defendant and that this plea is made in the alternative in the event that the court should hold that defendant neither expressly employed plaintiff nor the said George Beggs for said purposes. And in the alternative plaintiff further alleges that the reasonable value of his said services and the services of the said George Beggs is the said sum of $2,000.00."

The defendant specifically denied the allegations on which plaintiff seeks to recover and, in connection with giving plaintiff a list of its properties, defendant alleged that it wrote plaintiff as follows: "In order that no misunderstanding shall arise, we desire to state that we are not listing these properties with you for sale; but, on the other hand, we are furnishing you this list in order that you may submit to us for our consideration such deals as you may care to present."

The defendant alleges further that a proposition was submitted to it for exchange of its properties for the McGregor Ranch by a broker named Pawkett, and it agreed to pay said broker a commission for his services; that the plaintiff at no time had ever submitted to it any proposition on the McGregor Ranch, and that it

in good faith obligated itself to pay Pawkett a commission for his services without having theretofore had any notice from plaintiff or George Beggs that they, or either of them, were claiming to be the procuring cause of the exchange of lands or that they, or either of them, were claiming a broker's fee because of such trade.

We will not further notice the pleadings and we apologize for the length of the statement covering appellant's pleadings, but we have given a rather full picture of his pleadings because we doubt that the plaintiff has alleged a cause of action against the defendant.

The cause was tried to a jury, and after all the evidence was heard, the trial court gave the jury a peremptory charge to find for the defendant.

The plaintiff brings the cause before us on a writ of error and has two assignments of error in his brief, both being to the effect that the trial court erred in peremptorily instructing the jury to find for the defendant.

We do not believe that there is another case on record, where the facts are even practically identical with the instant suit.

The sum and substance of plaintiff's pleadings are that the defendant, being desirous of exchanging some of its city properties for ranch properties, employed George Beggs of Forth Worth, a real estate broker, to endeavor to make such exchange, and that one of George Beggs' duly authorized agents employed plaintiff to assist Beggs in the undertaking and that plaintiff contacted another broker named Pawkett and advised him of the wishes of the defendant and that Pawkett got in touch with the exclusive agent of some ranch owners who were interested in making such a trade and that Pawkett "went around" the plaintiff and ignored him and took the ranch owners to Waco, Texas, and presented them to the defendant, and a contract of exchange of properties was then made between the parties; but that prior to such contract being made, the plaintiff had discussed the very same ranch properties with the defendant's officers, and they had instructed him to obtain for them a proposition from the ranch owners as well as propositions on other ranches; and that, after Pawkett went around plaintiff, the plaintiff advised the defendant of his connection with the deal and his claim for a broker's commission in bringing about the trade. That such com-

mission is owing to George Beggs and plaintiff, but Beggs' duly authorized agent assigned all of Beggs' interest in the commission to plaintiff.

It appears to us that, under plaintiff's pleadings, the defendant is not at fault, but after the facts were adduced, it is clear that neither Beggs nor plaintiff has any claim on defendant for a broker's fee.

█ Plaintiff can derive no more right than that enjoyed by Beggs. Plaintiff's pleadings and his evidence make it certain that plaintiff's relations with defendant were brought about solely by Beggs employing plaintiff to assist Beggs and his agents in trading defendant's properties; and plaintiff pleads that these facts were made known to the defendant. Plaintiff does not contend, nor can he, in equity and good conscience, contend that he was dealing with defendant in any capacity except as a broker working with and through George Beggs in an effort to obtain an exchange of defendant's properties.

Plaintiff never at any time advised defendant that he alone was engaged in such undertaking and that he was the assignee of all of Beggs' rights, under whatever contract Beggs had with the defendant. Had he made such disclosure, it is possible that the defendant might not have wanted to deal with the plaintiff, in his individual right.

Plaintiff put McBrayer on the witness stand and this witness testified to his employing plaintiff to assist in the exchange of the properties; "that if he would find something we could trade, that he and I would split the commission from the Cameron end, and whoever he contacted to tell them that they must get their commission from the owner of the land. That was the arrangement I had with Mr. Grimland."

When questioned about the so called "assignment" to Grimland, this witness said: "I don't recall whether I ever actually assigned it to him in writing, I did verbally. John came to the office and I told him I was tired of monkeying with the deal and that the office was criticising me for spending so much time on it, and to go ahead, and if he made the deal he could have any commission that our office may be entitled to or might have earned, and to just go right ahead and forget me on the whole matter." As to any consideration passing, he said: "Well, I don't know that

there was any consideration. I just gave it to him."

The witness was asked: "Did George Beggs ever authorize you to give away that commission to Mr. Grimland?" To which he answered: "No, other than he just told me to handle the thing to suit myself."

This witness testified that he knew that any proposition he might make to Cameron & Company, he would have to get some agreement with such company about a commission.

The record shows that neither McBrayer, nor plaintiff Grimland, nor any other person representing or associated with George Beggs, ever submitted to defendant company any proposition covering the McGregor Ranch.

If plaintiff Grimland stands on what occurred between him and the officers of defendant company, at a time when he was supposed to be associated with George Beggs, in endeavoring to obtain ranch lands for which defendant would trade, and when he did not disclose to such officers that he was acting alone—not in conjunction with Beggs and the agents of Beggs—then he is confronted with the fact that his employment was limited. He was given the following written instructions: "In order that no misunderstanding shall arise, we desire to state that we are not listing these properties with you for sale; but, on the other hand, *we are furnishing you this list in order that you may submit to us, for our consideration, such deals as you may care to present."* (Italics ours.)

█ It seems clear to us that, under such a contract, neither Grimland nor George Beggs could earn a broker's commission, until the broker submitted a proposition that was considered by Cameron & Company and a trade finally consummated by reason thereof.

Grimland never submitted any proposition covering the McGregor lands, and the most that can be said of his testimony is that he mentioned such ranch lands to defendant's officers as a prospective trade and was told to see what kind of proposition he could get from the ranch owners.

The lists mentioned in such letter were not enclosed and some five days later, after the defendant had received a letter from Grimland saying: "You failed to enclose said list and we are waiting for it in order to put it up to Mr. Caldwell"

(owner of a different ranch), the defendant answered: "We are enclosing herewith three lists of real estate which we failed to enclose with our letter of October 16th, in order that you may submit to us the proposition for our consideration on the Caldwell ranch. You understand that some of this property might be sold prior to the time that you submit the proposition, because we are not passing up sales."

It seems significant to us that neither Cameron & Company nor Grimland made any mention of the McGregor Ranch in any one of these three letters.

After Grimland found that Pawkett had "gone around him", he wrote Cameron & Company, on November 6th, 1935:

"You will recall at the time of my last visit to your office, I submitted to you for your consideration the *McGee Ranch* (Italics ours), consisting of some forty thousand odd acres of land located in Culberson County and advised you I would get additional information and forward same to you.

"I secured this listing from a *Mr. Paucett* of this city, who had it listed through a Mr. Wilmoth, a broker of Pecos, Texas.

"My understanding, to begin with with *Mr. Paucett* was that he was to secure his commission if a deal were made from the owner of the ranch taking care of Mr. Wilmoth out of his share of the commission and I was to secure my commission from Wm. Cameron & Company, brokering same with Geo. Beggs. After submitting this ranch to you *Mr. Paucett* and myself had a controversy over the split of the commission and he advised me that the ranch had been sold to some party in Dallas.

"I received information today that *Mr. Paucett* and Mr. Wilmoth had visited Waco, submitting this ranch to you and were now in San Angelo inspecting your property, they expecting to make the deal and cutting me out of my share of the commission.

"Knowing you as I do, I am requesting that you advise *Mr. Paucett* and Mr. Wilmoth of my connection in submitting this property to you and that my share of the commission will be paid in the event of an exchange of the property with you.

"Regarding the Caldwell Ranch, I have been in constant touch with Mr. Caldwell and he has been delayed in coming to Fort Worth due to the press of business, but has advised me that he expects to be here the latter part of this week, at which time we will come to Waco with him and try to make a deal on his property.

"Assuring you of my regret in drawing you and your company into this controversy, and that I will appreciate your co-operation with me in the matter, I am, yours very truly."

If the mistake in the name of the ranch serves any useful purpose, we would say that calling it the "McGee" ranch would not be sufficient to call the defendant's attention to the McGregor Ranch, and the details found in the letter telling how and from whom the writer secured the listing, his connection therewith, and the complaint on his part that *Paucett* (meaning Pawkett) and Wilmoth were "going around him", all go to corroborate the further testimony that this letter furnished the first information that Grimland had any connection whatever with Pawkett.

■ From the record, it appears that Cameron & Company acted in good faith in dealing with Pawkett. The record affirmatively shows that Cameron & Company gave no exclusive listing to any real estate broker, and that it contracted only to consider definite propositions. The letters between Cameron & Company and Grimland can be construed in no other way than that Cameron & Company would deal with any real estate broker on a "first come, first served" basis, if a proposition were submitted, considered and a deal made.

But Grimland contends that Cameron & Company's letter to him, answering his letter dated November 6th, 1935, shows that Cameron & Company was not "neutral" in its attitude, as between Grimland and Pawkett.

This contention is predicated upon the language used in such letter, wherein Cameron & Company again called Grimland's attention to the fact that it had never listed its property with him for sale, and had never authorized anyone to do so; and calling his attention again to the fact that when he was in Cameron & Company's office and asked for a list of the properties, he did so in order that he might submit a proposition on the Caldwell ranch; and calling his attention again to the language used by Cameron & Company, in its follow up letter (quoted twice supra), in which it made its position clear and desired to avoid any mistake in connection with its

dealings with Grimland, and the letter closes as follows: "In view of your attitude, as expressed in your letter, we will thank you to kindly return to us the lists of property, and we are now advising you that we do not care to have you submit to us the Caldwell Ranch, or any other property."

If we correctly analyze the situation presented in the record before us, it is, that Cameron & Company endeavored to make plain to Grimland that he was to obtain and submit to it actual propositions in relation to proposed exchanges of property, which propositions were to be considered by it, and some proposition worked out and accepted before Grimland could claim a commission on any deal made.

Grimland had not submitted any proposition to Cameron & Company which remotely involved the McGregor Ranch. At best he had only mentioned this ranch as a prospective deal to Cameron & Company, and yet, when another broker brought the parties together and caused a proposition to be submitted, Cameron & Company finds Grimland making claim that he is the procuring cause of bringing the parties together.

It was to avoid just such claims and demands that Cameron & Company wrote Grimland, as it did, defining his status and advising him of the basis on which Cameron & Company would deal with him.

Is it small wonder that, under such circumstances, Cameron & Company wrote Grimland as it did and demanded a return of its lists of property in his hands, and notified him that it did not care to deal further with him or to consider any proposition he had or might make? We think not!

Cameron & Company was endeavoring to prevent just such a lawsuit as the one before us, namely, a suit based upon the theory that Cameron & Company listed its properties, generally, with a broker and that such broker was the first person to mention, or bring about a meeting of, a prospective buyer, or trader, with Cameron & Company, and with whom a trade was afterwards made.

The record discloses that Cameron & Company was dealing with several brokers, and had advertised its properties for exchange, and that it held itself out to every such broker as being willing to receive and consider propositions made to it for the exchange of its lands.

Pawkett was the first broker who brought the parties together and secured a proposition for consideration. He alone earned the commission.

If Pawkett "double crossed" Grimland, his cause of action is against Pawkett and not against appellee, Cameron & Company.

The following cases seem to control the case before us: Higdon v. Channell, Tex. Civ.App., 109 S.W.2d 254; Clamp v. Patton, Tex.Civ.App., 5 S.W.2d 584; Lynch v. Elliott, Tex.Civ.App., 114 S.W.2d 1189; Hughey v. Martin, Tex.Civ.App., 15 S. W.2d 656; Walker v. Van Valkenberg, Tex.Civ.App., 291 S.W. 936; Lumsden v. Jones, Tex.Civ.App., 205 S.W. 375.

The judgment is affirmed.